This is also the first occasion in which we were to sit with 15 judges on our on-bank court but we have two who were unable to be here because it came up unexpectedly. So we have Judge Rawlinson and Judge McEwen on the phone, is that correct? That's correct, Judge Rawlinson. Very good. And so we understand that counsel are all checked in and ready to proceed. Good afternoon. May it please the Court, my name is Angela Sierra, and I represent Phil Lockyer, the Attorney General of the State of California and the California Department of Health Services, the defendant's appellants in this case. I will be splitting my time evenly with Mr. Cronlund, the counsel for the interveners in this action, and I will be reserving two of my 15 minutes for rebuttal. There are three main points I would like to present this afternoon. First, the question of whether the grant and program provisions of California Statute, AB 1889, are preempted by the National Labor Relations Act, raises an important question of federalism, namely, absent express congressional direction with respect to the question before us, how to strike the proper balance between the Federal and State interests in this case. The State interest at issue is California's decision on how best to spend its funds. California has decided that while it would leave — it will leave employers absolutely free to use their own funds to promote or resist union organizing, employers cannot use State grants and fund money for that purpose. Second — Can you help me a little bit with the idea of using State money? Yes. I would have thought that once the money is paid for goods and services, it's not State money anymore. It's private money. So, for example, the education system may have a rule that State money and local money cannot be used for partisan political purposes. So a schoolteacher can take their State salary, even if it's their sole source of income, put it in a checking account, and use part of it to pay for her trip to be a delegate to the Democratic Convention. Why is it any different with the contractor? Why isn't it also private money and not State money once the contractor has exchanged goods or services for it? Well, with respect to the provisions at issue, the grants and programs, they are very different than a typical commercial transaction. And with respect to grants and programs, the State, in effect, is funding the effort and services by a second party that are typically hard to measure, not just buying a chair or a widget. Purchasing services, be it job training, be it medical services. What does that matter, though? Once the money is paid for goods and services, the contractor can buy them. In our view, it matters because it is California's intention, the legislator's intention, is that as much of 100 percent of those funds that we are paying for programs and services are being used for those programs and services. But does a schoolteacher be prohibited from using any of her salary for partisan political purposes? Not under the terms of AB 1899. In our view... I mean, could the State of California do that if it chose to pass a statute to that effect? That may be a different question in that the, with respect to labor relations, the National Labor Relations Act does expressly protect employee actions and employee rights. And the difference here, and I should back up, we are not saying when the money goes to a third party. In our view, the State, the character of the money changes when it goes to a third party. Let me focus a little more right on the contractor issue. There are probably a lot of contractors who get 100 percent of their money from the State of California. I imagine some people that do highway work are like that. Also some people that do social services, like messaging children with autism, going to their homes. They probably have firms that live entirely on State contracts. Are firms that get 100 percent of their revenue from State contracts prohibited from imposing unionization? Yes. If the funds that they wish to do so are State funds, are they receiving the funds from the State? Hypothetically, 100 percent of the revenue of the firm comes from State contracts. So is there still an if? Do you have an answer? Do you understand my question? Yes, I do. And the answer is they would be prohibited. But I would like to add that there may be other sources of income that that employer may use. There may be investments. There may be sources of income from a parent corporation or a separate corporation. But in the analysis of the preemption, in our view, the bigger question becomes, is there anything in AP 1889 or the State statute that is prohibiting that employer from seeking alternative sources of funding to engage in the activities that he or she would use to engage in? Basically, unless the employer puts in money that the firm does not earn, it cannot impose unionization. It's 100 percent of the revenue from the State. In that hypothetical, yes. But again, we are the Why is that contrary to the National Labor Relations Act? Because the general concept of the National Labor Relations Act and preemption is looking to whether or not the State is regulating. In our view, to answer whether or not the State is regulating an activity, one looks to whether the State is absolutely prohibiting it or if the State is just deciding not to fund it. For example, in the long line of First Amendment cases, that question has come up. When does a condition on a subsidy or a fund become a regulatory, become a punishment? And time and again, the courts, the U.S. Supreme Court, in Russ v. Sullivan, for example, in Reagan v. Taxation without Representation, has held that as long as the recipient of those funds has the right and ability to still engage in that activity outside of the government program, then the action by the government is simply not regulatory. Let me follow up on Ms. Kleinfeld's questions just so I fully understand your answer. Let's say that the entity in question is a corporation, which assumes it's something. Let's assume it's a corporation. And it earns all of its income from state government contracts. And at some point, it pays a dividend to its shareholder or shareholders. And as soon as a shareholder gets a dividend, let's say it's a closed corporation so there's really only one shareholder. He turns around and makes a further contribution to the corporation of capital. Could the corporation use that money for these purposes? In our view, yes. That the character of the state funds has changed. It has been given to a third party for legitimate purposes, not purposes with respect to the actual program. I have assumed no share of, you know, it's a real dividend. Yes. I'm assuming that all these things are modified. If that's your answer, and I thought that might be your answer, isn't this a little bit sort of make-believe or sort of Neverland? Well, to one extent, we are the State is not attempting to control third parties who are controlling the use of state funds by third parties who have not contracted or have not accepted the restrictions of the State of California. And again, if it is not a subterfuge, California is not saying that when vendors are providing goods and services, there may not be some legitimate overhead expenses and some legitimate business expenses. What it has done here is define and recognize that there is one particular what may be called an overhead expense or a business expense that the State of California does not find necessary for its programs and services and, therefore, will not fund. Whether there may be an alternative way or a broader way to ensure that more of its money is going towards the programs and services may be another question, but that seems to me not a reason to find this provision invalid or unconstitutional. Counsel, if this, in fact, is purely State regulation, why does the Act put the enforcement some of the enforcement provisions in the hands of individuals, unions, and others? Well, there is a provision that taxpayers have a right to bring in action if, after getting notice of the Attorney General, the Attorney General has not filed an action. But this is not a novel concept. We're enforcing the State regulations, the Attorney General or the general public? Well, the Attorney General has enforcement powers, but as many statutes provide, the taxpayers do have standing to bring these actions. To me, in my mind, it's a recognition by the legislature that the State, the Attorney General's office, has scarce resources and cannot simply be the only enforcing body. Do the non-Attorney General cases generate revenue to third parties? Well, no, but neither does AB-1889. AB-1889, the civil penalties go to the State. These are measured civil penalties. They're the return of the State money plus twice the amount. If the expenditure is not large, if it's, for example, $500, then the civil penalty is going to be $1,500 paid to the State of California. I'd like to direct your attention to one of the amici briefs, the NLRB's brief. They seem to raise the argument that Labor tried to amend this particular act through Congress and failed, and so that essentially what Labor has done is go to all of the States and do by indirection what they're not able to do by direction, therefore defeating the preemption agreement, going to, you know, obviously going to elected officials who might be much more interested in getting the vote of Labor than preemption. Why isn't that what's going on here? They can't get it amended in Congress, so then they go to all of the States to get statutes like this. Well, in my view, the ultimate question is not who has supported or proposed the bill. It is what does the statute actually say? What does it do? And in that respect, I do think it is important to note that in several very broad Federal funding statutes, the Head Start statute, for example, the National Community Service Act statute, these are Federal statutes that have the identical prohibition in those Federal statutes that Federal monies used for those programs shall not be used to assist, promote, and deter union organizing. To me, those are evidence that Congress has seen that this is a legitimate type of statute. These are legitimate concerns that Congress has recognized. And in our view ---- That's Congress doing it, right? That's true. Now, isn't that different? I mean, how does that dovetail into a preemption argument? I mean, if Congress had wanted to do it here, Congress could have, right? That's correct. And did not. That's correct. But when looking at preemption, since we don't have an express preemption clause, we have to discern what is the congressional intent. And ultimately, the question is, would State activity frustrate the purposes of the NLRA? And the fact that Congress has had or seen fit to have similar or almost identical provisions, in our view, is very strong evidence that Congress does not see this type of statute as interfering with labor relations. I see that I'm running out of time, and I'd like to turn it over to my co-counsel or, excuse me, counsel for the interveners, and I will reserve some time for rebuttal. Thank you. Good afternoon. No one disputes that the First Amendment gives employers the right to express their views about whether their employees should be unionized. And no one disputes that Congress accommodated the NLRA to the First Amendment by providing that noncoercive speech is not an unfair labor practice. But nothing in the NLRA suggests that Congress actually intended to force California to subsidize employer speech about unionization just because California is giving the employer grant or program money for a completely different purpose. Counsel, how do you respond to the argument that's in the now withdrawn majority opinion that actually it isn't just State-funded speech, that once the grant had been paid or the services were paid for, at least some portion of that money is profit that actually belongs to the employer or the recipient of State funds, and that at least that portion of the money actually isn't the State's at all? Well, first, the particular provisions of the statute that are issued don't deal with ordinary business transactions. It's not the State buying widgets. They're grants and State programs. Ordinarily, a grant is a pure subsidy. It's the State's money. And a program, there's no definition in the statute, but it seems to be something like the Head Start program or the Medi-Cal program, where California is subsidizing the delivery of services to third parties. Well, you're hiring teachers, nurses, trainers, all kinds of people at a price, and there's a profit that the employer makes for placing those people in the position of serving the State's interests. There's got to be a profit, or they're going to tell you to go fly a kite. Either that or they're a charity. Well, many of the participants and grant recipients are nonprofit organizations. There are times when the State pays a couple of hundred thousand dollars for medical research because the State wants a few hundred thousand dollars' worth of medical research, not because the State wants something specific and measurable. If there was a specific program that allowed the recipient to earn a profit rather than return the unused money to the State or roll it over to the following year, and we don't know that there is, once that money is paid out, it might well not be covered by the statute. The plaintiffs didn't give the State courts the chance to answer that question. There's no indication that these programs or these grants do contain a profit component. And certainly a typical grant would not involve a profit. Is there anything in the record to prove the contrary, that there's never a profit made by anybody under any arrangement that the State makes under grants and programs? No. There's certainly nothing to suggest that there's never a profit. There is something to suggest that many of the participants are nonprofit organizations. And there's nothing to suggest that if the particular grant or program allowed for a profit at the end of the day, the profit couldn't be paid out and would not be regarded as State funds. We're talking about dirt work and laying asphalt, and it's all done by nonprofits? No. I think what we're talking about are things like job training grants that are made to nonprofit organizations. But it applies to dirt work and laying the asphalt, doesn't it? Not the provisions that are issued here. There is a provision of the statute that deals with State contracts. It's 1645.4. That's not at issue on appeal. This appeal only involves two provisions of the statute. One of them deals with grants, and the other one deals with participants in State programs. Actually, the only area that I have some familiarity with is services for people with psychiatric disabilities, like autism. I understand that some of the firms that perform those services are nonprofits,  and some of the firms that perform those services are for profit. So some money goes to wages and salaries, and some goes to profits. Am I confused? Is there some restriction of grants to nonprofits in California? Some grant programs may be restricted to giving grants to nonprofits. This is a generic statute that would have to be implemented on a grant-by-grant basis. There are certainly some grants that would require that. If there's money left over at the end of the grant, it goes to the State. And as I said, if there were a particular grant that allowed the recipient of the grant to earn a profit at the end of the year, rather than return the money or roll it over, and the money for profit was paid out, it's not clear that that's the money that would be covered by the statute. California seems to have modeled this statute on the Federal statutes that impose the same restrictions. It's not clear that that would be money that would not be covered by the statute. Tell me what is clear. Are profit-making companies covered? Are nonprofits firms covered? Every recipient of a grant is covered with respect to the State funds that they are receiving. The question that I believe Your Honor is asking is what if the grant permits the recipient of the grant to earn a profit from the grant money, rather than requiring that all the grant money be spent for the particular activity? And that's the question on which a logical interpretation of the statute would be, that if there is a profit left over and it can be paid out, such as a dividend, that that would no longer be covered by the statute, because the statute refers to State funds and to an intent by the State not to subsidize employer speech about union organizing. Are you saying that the statute only applies to money that would have to be kicked back to the State to be used on program expenses? Or money that would have to be used the following year on program expenses. That at least is a logical interpretation of the statute. The State courts, again, have not been given any opportunity to interpret the statute. But then you address your argument as to why machinist preemption isn't involved here at all, or doesn't apply. Sure. The machinist preemption doctrine is about Congress's intent that the States not interfere with the use of economic weapons during labor disputes, that the States not restrict strikes, picketing, lockouts during labor disputes, because Congress didn't want the States to disturb the balance of power between labor and management during labor disputes. Assuming that speech during a union organizing campaign is an economic weapon in the sense the words are used in machinist cases, and that a union organizing context is like a labor dispute in the sense that it's used in the machinist cases, California isn't restricting any conduct at all. Employers are perfectly free to engage in any activities to assist or deter union organizing. What they're prohibited from doing is using State money, just like they're prohibited from using Federal Head Start money or Workforce Investment Act money. They can use other money to achieve that. So would it be different if the law said the recipient of a State grant can't use any money for union organizing, I mean, to favor or to oppose union organizing activities? I think that it might well be different if it did not permit the recipient some other alternative means of expression. For instance, cases like Regan v. Taxation with Representation, which prohibited nonprofit organizations from engaging in lobbying. Those prohibitions were held constitutional because the nonprofit organization could set up a completely separate entity to engage in the activities without using Federal funds. The same is true in Rust v. Sullivan. As long as there's another avenue for engaging in the speech, the restriction on the use of State funds should be upheld. And here California has imposed the narrowest possible restriction. It hasn't restricted recipients of grant money from assisting or promoting union organizing. It's restricted recipients of grant money from using the grant money itself to assist or deter union organizing. Although, of course, money is fungible, right? So which dollar you actually use for the activity is a little bit a question of bookkeeping. You know, you don't actually, I think the State doesn't come up with a wad of cash when it makes a grant and says, you know, here are the dollar bills and we've marked them and you can't use these. I mean, let's say there's some electronic transfer in some bank account. Some numbers change on a balance sheet. And the whole idea that you don't use that money, but you can use other things is a fiction. It's an accounting fiction, right? Well, I don't think Congress regarded it as an accounting fiction when they prohibited legal services programs from using Federal money to lobby or nonprofit organizations from using it. Congress doesn't engage in fiction? Is that what you're trying to tell us? Well, I think it expresses a legitimate government interest in not subsidizing private ideological activity. If you have other money, your own money to engage in the activity, you're perfectly free to use the other money to engage in the activity. The statute doesn't use the word subsidize, does it? It does. It's got strict accounting methodology. It does use the word subsidize in Section 1 when it states the State's purpose, which is to avoid subsidizing employer activities to assist or deter union organizing. And it does refer to the use of State funds and place no restrictions on the use of other funds. Does this record have any indication of how this statute has been enforced? No, it doesn't, Your Honor. The case was brought in Federal court. It was decided on summary judgment. The district court made no factual findings. That's why we've suggested that as it comes to this Court, it's essentially a facial challenge. There are no undisputed facts except that the statute exists and the plaintiffs are subject to it. The State courts did not have a chance to interpret the statute, neither did the State agencies that disperse funds have any chance to issue guidance. So the answer to the question is no, Your Honor. We don't have a record of how the statute was applied to specific cases. Let me ask you a procedural question. Do I understand correctly there were cross motions for summary judgment? There were cross motions for summary judgment, and they encompassed many issues besides NLRA preemption. What's before this Court is just an appeal from the district court's decision granting summary judgment to the employers. If you prevail, what would you have us do? And for what? It would be remanded for further proceedings. The district court's summary judgment would be reversed and the case would return. The employers made other challenges to the statute, which they would certainly be free to pursue on remand. So you would not be entitled to an order saying grant summary judgment to you at this stage? No. I would have to concede that the employers raised other challenges to the statute that the district court never addressed because it granted their motion for summary judgment on NLRA preemption grounds, and that to the extent the court found that factual findings were important, the district court never found any facts. Would you address the Garmin preemption, which is both in the panel opinion but also a ground for the district court order? The Garmin doctrine prohibits the states from interfering with matters within the jurisdiction of the NLRB. And to answer the question quickly, because I need to leave time for the Attorney General to do rebuttal, the state statute wouldn't interfere with anything that the NLRB is deciding. The NLRB decides whether certain conduct is or is not an unfair labor practice. Has the employer threatened the employees? Has the employer threatened to close the plants? The California statute deals only with the use of money. Spending money to assist or deter union organizing would be impermissible regardless of whether the employer's activity violated or did not violate the National Labor Relations Board, National Labor Relations Act. So there would be no interference with the board's jurisdiction. You have about three minutes left. I will leave the rest of the time to the Attorney General for rebuttal. Good afternoon, Your Honors. I would like to reserve five minutes of my time for rebuttal. But I do want to address one important issue. There's no rebuttal. This is it. Okay. Then I'll take it all. But you can reserve as much as you want. Thank you. You still don't get to use it. It's the Hotel California. I would like to address a question that was raised by Judge Schroeder as to enforcement action. She's Judge Schroeder. That's all right. There is in the record two examples of enforcement action that we submitted to the district court. One was involving Fountainview, where the State of California and the AFL have sued them demanding an audit of their records under AB 1889. The State stipulated in that case that Fountainview had adequate private funds to fully support any union activity that it engaged in, and they're still prosecuting them. That matter has been stayed pending the outcome of this appeal. So they have acknowledged that it doesn't matter under this statute whether you have enough money from other sources. They're still going after you. The second one that we introduced in the record was a ---- I'm sorry. I fail to understand. You're asking us to take judicial notice of this other proceeding? It's already in the record, Your Honor. And this is a proceeding that is partially completed? It's been stayed pending trial. The trial was on the EVA trial, and we have a stipulated ---- Was there a ruling from the State court? No. The trial court stayed the trial date a couple of weeks before trial, but we had a stipulated record for the trial where the State of California stipulated as a fact that the employer, Fountainview, had adequate funds from other sources in which to engage in the speech. It's a for-profit employer, and they nevertheless are prosecuting them under this statute. So what are they prosecuting them for? For an audit to find out whether or not they've improperly commingled funds, whether or not ---- Separate questions, aren't they? Pardon? They're two separate questions, aren't they? It's all part and parcel. It's conceivable that a for-profit company could have adequate independent sources to do this, but still have used State program or grant funds for an improper purpose under the statute, right? That's theoretically possible. It's only if you put form over substance that you say ---- No. What does it have to do with form over substance? You won't concede that a private profit-making entity could, A, have enough funds to engage in these activities through private funding, but, B, have nonetheless misused grant or program money provided by the State. Why is that hypothetical? Because if the employer has adequate money from other sources, then ---- It doesn't make any difference whether they took money directly from the State and applied it to a purpose the State disapproves of? The State is contending that if you have a bank account and you have $1,000 in it, and in this case $700 are from private funds and $300 are from State funds, that if you spend $200 to influence unions, you have violated the statute, and that's what they're prosecuting them for. Do you have a trust account in your law firm? Yes. Okay. Do you ever spend that money on stuff for the firm, to buy computers, to pay the partners, whatever partners here, pay dividends? Do you ever use trust fund money for that purpose? No. It's no longer customer money. We do not use a trust account money for payment of firm expense, but we do use our general ledger accounts. I'm worried that you hesitate. I mean, this is the ---- You do have some possibilities. I don't want to get you into trouble here, but if you can't ---- You know, obviously you have to segregate funds in running a law firm. You segregate funds in all sorts of business. I take it your law firm has employees, right? Correct. Okay. I take it you don't use the account where you put the Social Security funds, and you say, gee, I'm sort of busy, I can't go to the bank today. We're going to use that money to buy a computer or a file cabinet for cab fare. You don't do that, do you? Those aren't deposited into separate accounts. They're deposited into a single account, and we have general ledger entries as to making certain that we made our payment to the federal government for Social Security. So I understand the part that it's all a big fiction in terms of, you know, there is really no more real money. It's all accounting entries. But you understand that you and your law firm would be in very deep trouble, I'm not suggesting at all that you would ever do this, that if you took Social Security funds, the funds that your firm is supposed to put aside for Social Security contributions to your employees, and you said, you know, we're going to be careless, we don't really care, we're going to take the money out of there, make an accounting entry, and use that to pay the partners. There's no doubt about that, is there? And the fact that you might have other money to supplement wouldn't get you out of trouble, would it? I think there's a distinction if we were using a trust fund account. Don't maze me. You're agreeing that what I said is correct? With all due respect, it's my understanding that the issue with payment of Social Security is, did you pay the money, not which technical account you paid it from. I think, counsel, I'm getting confused here. The way I remember the law firm account, you don't have a separate account each time the client pays you. For that client, all client money goes into the firm account. Correct. The trust account is the trust account, which is not the firm's money at all. It's money that you're holding for somebody. Correct. And as I remember Social Security, when it's due, you pay it. You don't have a separate trust account. That's my understanding. Let me ask you, I think we're getting a little far afield, because the issue of government cost accounting is a complex one. It was not on that basis that the district court made its decision, is that correct? It was only in part that the commingling trap was evidence that this was intended as a burden on employer exercise of speech under the National Labor Relations Act. And with that in turn assumes that you interpret the Labor Relations Act as having this as a prohibited conduct, correct? Or a protected conduct. There's two aspects under. Protected or prohibited, correct? That is one aspect of Garmin. As outlined in the amicus brief of the National Labor Relations Board, there's a separate aspect of Garmin that comes into play beyond whether it's protected or prohibited under Section 7 and 8. And that is that the preemption is there to protect not only the substantive law of the NLRA, but also the administration. And the National Labor Relations Board has a responsibility under Section 9A to conduct elections to ensure employee free choice under Section 7. They have developed an entire body of law under the National Labor Relations Act which utilizes employer free speech to rebut union rhetoric during campaigns. Would you help me out to just point to the portion of the district court record, I mean, excuse me, the district court decision that is predicated on this commingling issue? The district court decision focused on machinist preemption and did not reach the Garmin preemption issue. In answer to my question before when I asked you if this was at all an issue in terms of the government cost accounting, you said, well, yes, it was. That was one of the predicates for the district court decision, and I'm just trying to understand where to look for the support for that statement. It's in our briefs to the district court. It was in our briefs to the appellate panel. Okay, but let me just be clear, so I want to make sure, it's not in the district court decision, is that correct? Correct. The district court said it did not need to reach the Garmin issue because it found machinist preemption. Thank you. Do you happen to know whether we have to grant a Chevron deference to the NLRB group? It is my understanding that Chevron deference is not appropriate, but that there's a doctrine called Skidmore deference where the NLRB has regulated in a sphere for a period of time. And I have to be honest, I'm not that familiar with the Skidmore deference. I was speaking with some counsel for the NLRB, and they raised that issue. As a general matter, how is this different from the situation the Supreme Court dealt with a couple of months ago on accepting government money and law schools wanting to restrict military recruiters? How is it different as a general proposition? The court, as I understand it in that case, said, you want to take the money, accept the restrictions. You don't want the restrictions, don't take the money. I'm not familiar with that case, but to the extent that it's similar to the Rust line of cases. The Solomon amendment. Yeah, the Solomon amendment. You're aware of the case? I'm a labor lawyer. I'm not familiar with that case. Just as a general matter, the challenge came from law schools who didn't want military recruiters to appear, along with private firm and corporate recruiters, because of the law school's disagreements with the military's stand on gays in the military. Don't ask, don't tell policy. And at the end of the day, the United States Supreme Court said you don't have to take this money, but if you do take it, you have to take it with the restriction. As a general concept, how is this different? Because constitutional analysis is different than preemption analysis, and the Supreme Court has specifically stated in the Gould case that we will not allow the courts, under the guise of spending power, to regulate conduct, which is covered under the National Labor Relations Act, under either Garmin or Machinist preemption. And so spending power cannot be a pretext for regulation. Does Machinist apply if, as you say, that the NLRB regulates through 9A, intensively regulates the conduct of elections and speech? How can Machinist then apply? That would be a form of Garmin preemption and not Machinist preemption. So the district court was wrong to rely on Machinist? We think that this is a very difficult issue. In the cases that you see by our own Supreme Court, they typically address it from both Garmin and Machinist standpoints because they all devolve from an underlying premise of conflict preemption, and therefore a lot of the principles are equally applicable. The market participation doctrine applies under both doctrines, for example, under the Boston Harbor decision. Is there any case where the federal courts have applied Machinist, aside from our case, this case? Yes. Have applied Machinist in the organizing side of the equation as opposed to the collective bargaining side of the equation, if you make that distinction? There are decisions dealing with not necessarily appellate court decisions, but there are decisions dealing with card check requirements that counties have imposed. The district court in the northern district had one of those decisions and struck it down under Garmin preemption. My question is, are you familiar with any federal cases that have applied Machinist to the organizing side of the equation, as opposed to applying Machinist preemption in the collective bargaining side? I am not familiar with one applying it. Typically, when they're interfering in organizing, it's much more of a Garmin issue. The question here becomes, is this regulation? Aren't they pretty much mutually exclusive? If you've got Garmin, you haven't got Machinist. If you've got Machinist, you haven't got Garmin. I mean, it's got to be one or the other, doesn't it? It's pretty much how it's played out, hasn't it? I believe this is more appropriately a focus of Machinist. I think that the answer to Zinzi's question is, aren't they mutually exclusive? If Machinist applied, then Congress has to – there's an area that Congress says, well, by concerning the statute, that that's a zone that no one can regulate. And Garmin is predicated on regulation. So they are mutually exclusive, would you say? I believe so. The principles get blurred in practice, and the court's typically analyzed from both sides. But I do believe that it's one or the other. And in this case, do you choose Machinist, you said? I personally believe it's Machinist, based on my analysis of case law. On behalf of who? On behalf of my client. But the National Labor Relations Board has put forth a very strong argument of how this interferes with their administration of elections, which is Garmin. And it depends on whether you look at the underlying issue of whether or not employer speech is directly protected under the National Labor Relations Act or is not a protected right. I think that's part of it. Counsel. NLRB has argued both. It's argued both Machinist and Garmin. Yeah. Counsel, if I could just ask you to leave the labor context for just a minute and ask you in general preemption analysis, is there any helpful authority bearing on the fact, in this case, that this is the state concerned about the use of its own funds? I am not aware of cases outside of the labor context dealing with the state fund issue, other than the pure constitutional cases such as Arrest. I do think that there were some helpful cases cited in some of the amicus that were filed at the en banc point where they note that some of the provisions in this statute strongly suggest this is regulation, because if it was not regulation, why would there be civil penalties? If it was not regulation, why would there be third-party enforcement of a breach of contract claim by unions in this case when they're not parties to that contract in the guise of being taxpayers? Those indicate that this is regulation. This is not something different, which was what was suggested by the AFL in their briefs. Is RICO has private right of action? Does that implicate this very at all? Key Tam has private right of action. Plenty of state statutes that have private right of action. Why does that present a problem in this context? It presents a problem because it goes to the issue of whether or not the state conduct is regulation or not, not whether or not there should be a private cause of action if it is regulation. Because it's regulation, it falls within the machinist doctrine, and because it does not fit under the market participation doctrine, it is then preempted by machinists. But Key Tam isn't regulation. Key Tam is quite analogous. Essentially, if I understand it correctly, it's a complicated doctrine. Somebody knows that somebody is stealing from the U.S. government, so they can bring an action to recover the money for the government, and they get a bounty. I'm probably making some of this up, but that's more or less how it works. So that's not right. This is simply using the fact that there are people out there who might have information as an enforcement mechanism in order to benefit the government. Why isn't this pretty much analogous to what California is doing? Because there's a significant difference. Here we have the National Labor Relations Board that's entrusted by Congress to set federal labor policy, and preemption says only the National Labor Relations Board and Congress can set federal labor policy. I think you probably didn't understand what they were saying. What they were saying is, look, California is out there. It does not wish its money being used for the purposes it considers illegitimate. And you say, this must be regulation because, look, they're having all these people out there enforcing it. And my question was, why is this just like Ketam, which is not regulation, where the federal government uses private enforcement not for any regulatory purpose? Ketam is not regulatory provision. It's a way of getting back to the government money that belongs to it. Why is this just like Ketam? I'm probably not even pronouncing it correctly. You know what I'm talking about? I understand what you're talking about. And from our perspective, it's one factor showing that this is regulation and that it then brings it under the machine. What's the big deal here? Why are you bringing this lawsuit, quibbling over this? You know, it's not so hard to keep track of these things. I realize it's maybe all a big accounting fiction and all that. What's the big deal? So, you know, we have all sorts of accounting that we have to keep in our lives. What's the big deal about this that California, from that firm that you were talking about that had that lawsuit, that they can't, if they've got plenty of money of their own to use for union organizing activities, what's the big deal showing that, look, we didn't use any of the grant money? Because the record is filled with examples that we submitted, that there are at least 500 members of the California Association of Health Facilities, one of the other plaintiffs, that are 100 percent dependent on the Medi-Cal program for their funding. And they are prohibited from engaging in any kind of speech as a result of this statute. It's a gag order. I'm sorry. They're not allowed to engage in any other business? Speech. If what the State is saying, that you must. They can't go and do business with somebody other than the State? Then the State is conditioning participation. I'm asking you a question. You say they are 100 percent dependent. Dependency 100 percent is a choice somebody makes. I'm asking you, are they by law required to do nothing else but deal with the State? No, they are not. Okay, so they could go get other business and become independent, right? Correct. Okay. But then you are conditioning participation in these State programs, not exercising Federal rights under the National Labor Relations Act. It would be a lawsuit, wouldn't it, if it's interfering with speech? We have argued that this is interfering. Because of that, 100 percent. I'm not arguing with a lot of assumptions that you have a right to State-sponsored employer speech. I'm sorry, I didn't. I mean, or State-subsidized employer speech. I mean, essentially what you're arguing is that you have a right to State-subsidized employer speech, aren't you? We are contending that the State does not have the right through this statute to either prohibit or chill employer speech when it's essential to our national labor relations policy. Well, essentially, though, we have to say that it's some aspect you're giving. You're arguing that the State must subsidize employer speech in this context if it's 100 percent fine, aren't you? We believe that it may be possible for a State to pass a statute that deals with efficient procurement of services that is unrelated to regulating Federal labor policy. And so if that was their purpose, they could have done it. They did not do it in this case. They specifically focus on Federal labor policy. They specifically focus on employer speech. They say it's the purpose of this statute in the preamble not to interfere with employee choice. And they've said employer speech interferes with that, and they don't want to subsidize it. The National Labor Relations Board says employer speech is part and parcel of our Federal labor policy. It's not up to the State to make that policy decision. Well, if you take the preamble at its word, what it espouses is government neutrality. It says we don't want government funds to be used to subsidize any part of this debate, whether it's pro-union or anti-union. Now, considerably, the effect is greater on employers because if they're engaged in anti-union activity, there's no doubt about that. But isn't it just removing government spending from this economic area? The Supreme Court has recognized in the Levitas v. Bradshaw case that professions of neutrality by the State don't end preemption analysis. You must still look at it from a preemption analysis standpoint. Under machinists such as Boston Harbor cases, is this regulation, and does it fall in the market participation exception? In this case, it does not fall. It is State regulation of employer speech, and therefore it's preempted. Let me ask you about these 500. Is there anything in law prohibiting their owners from contributing their own money to these entities and have them use that money for union organizing activities? Nothing by law that prohibits it. But then you're dealing with, as Mr. So they could, for example, if they paid out a dividend and the owner thought we'd be much better off making sure the next dividend is really fat, by avoiding a union, it could kick back 10%, 15%, 20%. The State has already told us that they consider that not to be a violation, and they could kick back and say, okay, use this to fight unionization. The statute doesn't say that you can use profit. It says any State funds, and they follow it all the way down. So you're taking a position different from the Attorney General? You think that that would be a violation? I'm taking a position different from Mr. Cronlin. I didn't believe the Attorney General weighed in on it. The Attorney General said any funds are traceable, and they remain State funds all the way down until you consider them. I asked for that very question. I asked Ms. Sierra. Sierra? That very question. I asked her what happens if they pay a dividend and the sole shareholder then says I'm going to send back part of that dividend to fight unionization, and she said we don't think that would be covered because she said, I thought she said, that would break the continuity. We call the bake sale to raise money, but part of this is the statute says upon receiving the contract, you must certify that you will be in compliance at a future date whether organizing ever occurs. You must set up your separate bank accounts at this time even if organizing never occurs to prevent the possibility that funds will be commingled. I have a nonprofit that I was once very familiar with on the board. It didn't have any owners. There wasn't a dividend as is typical of nonprofits. So I was trying to go through what you were saying, and the only thing I could think of in what you were saying that would have us have any money that was not received from the State would be the bake sale. But I think if we put the bake sale in the general fund and then used the bake sale money out of our checking account to close the union, that would have been a violation of the statute. Correct, because of the commingling presumption. What's the problem with making a bake sale bank account? Do banks not open accounts for you in California? No. I get letters every week offering me free checking accounts. And have you ever received two paychecks from the same employer? Because that would be required because to the extent... Not from the same employer, no. Because to the extent that you're... There were a couple of transitional periods where I got... Because employee salaries are a covered prohibited expense that cannot be commingled, and therefore you have to show that those were paid from separate funds, that your lighting in this building was paid out of two accounts because an hour was spent talking to your employees. That is the kind of burdensomeness this statute was imposed on to chill employer speech. You said two checks to the utility company, two checks to the landlord, two checks to each employee. Correct. I don't understand why... Because you're not... If you've engaged in speech, you must show that they were done from separate accounts, including employee salaries and other expenses. And to the extent that that payment came out of a single account, the statute says there was an irrebuttable presumption that you've used funds inappropriately in proportion to the amount of state funds you received, and therefore must pay back treble civil damages to the state. Well, the state attorney general said in their brief that that was not the case, that your employee example was incorrect, that you did not have to pay the employees out of two separate accounts. The statute itself says employee salaries. That's not the state's interpretation of it, I gather. Is that a dispute over what the interpretation of the statute is? The state has introduced three different interpretations of the employee wage component in opposition to the summary judgment. First, they said employee salaries were covered in a letter to an employer on enforcement. Then, in opposition to the summary judgment, they produced another letter that said it was not going to be covered unless the employer was using, encouraging the employees during work time to engage in that activity and raising issues on whether or not the employer is engaged in surveillance under the National Labor Relations Act. So they are trying to use a shifting discussion of the very wording of the statute and embroil employers in litigation to chill speech. Maybe you just brought in the wrong forum. You know, there are all these state law issues that seem to be unresolved, and we're trying to apply some of the most complicated federal preemption doctrine with no clear picture as to what this statute does in terms of state law. Garmon has indicated that we do not look at the ad hoc effects of the statute. You look at the category of classes and ruling whether there's preemption. We believe we have established that principle in this case, which would not require a remand. So basically you're agreeing with your opposing counsel that this amounts to a facial challenge and we ought to analyze it like that. It is as applied to employers covered under the National Labor Relations Act. But an as-applied challenge is somewhat different under specific circumstances. I mean, really, this is a facial challenge to the statute. We have cited Ninth Circuit precedent in our brief, and I don't have the exact case where they've recognized as applied to groups of coverage. So we believe it is an as-applied challenge within Ninth Circuit precedent. Is there any weight that we should give to the fact that there were attempts to amend the act by Congress and those failed and then that's when the state litigation came up? Does that have any evidence of anything? We believe so. We argued in our brief that this is a de facto attempt to do an end run around the National Labor Relations Act through multiple state litigation, legislation and litigation. A similar statute was passed in New York and the district court, in reliance on the first panel's decision by Judge Fisher, found that the New York statute was similarly preempted. And they have similar legislation in as many as 19 other states in varying degrees. So they are attempting to totally rewrite the National Labor Relations Act and Federal Labor Policy through state statutes and local ordinances. All right. Your time has expired. Thank you. I just have a few brief points. One case we find very helpful with respect to the question before us is Judge Easterbrook's recent decision in the Lavin case. Whether we're reviewing this case under Garmin preemption or under Machinist preemption, there is a preliminary question that needs to be asked. I thought that case urgent because it says conditions on spending may be some regulation if they affect conduct other than the finance project. Well. Did you have an opinion on what the case means? You were going to tell us. Yes. Well, that case, in the context of that case, the finance project was the renewable fuel plants. In our case, in my view, the Lavin decision is very helpful and very helpful to show that AB 1889 is not preempted. In that California is restricting the use of its funds for by employers to influence its employees about union organizing. But it is allowing the employers to still engage in those activities. And unlike the Gould case in which the Lavin decision contrasted with its situation, we are not penalizing the employer who engages in that activity outside the transaction with the State of California. How can we get back to the sentence that I asked you about? The sentence in the 7th Circuit case that says conditions on spending may become regulation if they affect conduct other than the finance project. Why doesn't that put your case in the other category where it is preempted? Because the AB 1889 provisions aren't affecting conduct outside the grants or programs that the State of California is funding. One can be a provider of grants or programs for California while at the same time engaging in activities related to influencing the employees as long as they're using the State money. So as I read Lavin and I read that sentence, that is the analogous situation to AB 1889. We're not affecting the transactions that the providers of programs and services are engaging in as long as they're doing it outside our project with other funds. But it's different. You're not saying I'm only giving you this money to build a bridge. I'm only giving you this money to do such and such. You're saying, you know, that's separate and apart. You're saying, and by the way, you can't use this money for, you know, a bridge. So AB 1889 is saying you can't use this money in any of the programs or grants. Each program or grant would be like the construction project or the renewable fuel plant in Lavin. Or in any of the examples, the public works projects, it would be an analogous situation. We are saying, we are not saying that the employer cannot engage in those activities if they're going to be providing grants or programs to us, but, excuse me, the services through the grants or programs, but they simply must do it with other funds. I'm sorry to have eased your time. Thank you. Thank you. Case discharge is submitted for decision. And that concludes the Court's calendar for this afternoon.
judges: Schroeder, Reinhardt, Beezer, Kozinski, Kleinfeld, Hawkins, Thomas, Silverman, McKeown, Wardlaw, Fisher, Paez, Rawlinson, Clifton, Callahan